In the Matter of Solomon Brinn, an Attorney, Respondent.

First Department, December 31, 1930.

*Einar Chrystie*, for the petitioner.

*George Wolf*, for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term of the Supreme Court of the State of New York, Appellate Division, First Department, on November 17, 1902.

The petition presents two charges of misconduct. Briefly they are as follows: (1) That the respondent converted to his own use the sum of $226.20, which he received from his client Sarah Epstein on April 7, 1927, to be used solely for the purpose of paying taxes on her property, and failed to pay said taxes until January 19, 1929, after an attorney retained by Mrs. Epstein had made repeated efforts to compel the respondent to do so. (2) That the respondent converted to his own use the sum of $104 collected in behalf of his clients Harry Galler & Brother in March, 1928, and failed to pay the same until after the matter had been brought to the attention of the Bar Association in June, 1929.

Respondent's answer to these charges is, as to No. 1, that he forgot to pay the taxes, and as to the delay following notice from his former client's new attorney, his claim is that he required the time to verify the fact that the taxes had not been paid; as to No. 2, he asserted authority to use the money given him by one of the members of the firm of Harry Galler & Brother.

Following respondent's answer herein, the matter was referred to one of the official referees, who has duly reported. The petitioners now move for such action as the court may deem just and proper.

The record shows, as to charge No. 1: In April, 1927, Sarah Epstein, the wife of Ike Epstein, purchased premises 658 Bedford avenue, Brooklyn. Respondent was present at the closing of title representing the purchaser. Samuel Slote represented the seller. At the closing a question arose as to some taxes. Slote gave respondent his personal check for $226.21 and respondent signed a receipt therefor, as follows:

" 658 Bedford Avenue, N. Y.

" Received of Samuel Slote his check in the sum of $226 21 /100ths Dollars, covering taxes November 1924 and 1925 on the above premises."

Slote's check was indorsed by respondent and collected in the regular order. A year and a half later Mr. Epstein learned the taxes had not been paid. He consulted Jacob P. Shulman, an attorney having offices at 288 Grant street, New York. Shulman

testified that Epstein consulted him in the latter part of 1928. Shulman wrote respondent several letters, as follows:

" *October* 3, 1928.

" Solomon Brinn, Esq.,
 " 2 Lafayette Street,
  " New York City.

" Dear Sir: You telephoned me this afternoon to the effect that you received a telephone call from Attorney Samuel Slote of 15 Park Row, New York, to the effect that he turned over to you his check for $226.20 on April 7, 1927, at the time of closing title to certain premises 'wherein you represented Ike Epstein, the buyer thereof.

" This check is now temporarily in my possession; it bears your endorsements ' as attorney ' and individual endorsement. Furthermore, I am informed that you executed a written receipt to Mr. Slote for this check wherein you agreed to apply the same for the payment of the second halves of the 1924 and 1925 taxes and accrued interest thereon. It has just been discovered that these taxes have not yet been paid and I am directed to write you asking for the prompt return of $226.20, together with the additional interest which accrued on those taxes to this day.

" Yours very truly."

" *October* 8, 1928.

" Solomon Brinn, Esq.,
 " 2 Lafayette Street,
  " New York City.

" Dear Sir: Since my letter to you of October 3, 1928, I also gave you the lot and block number of the premises in question for the purpose of giving you an opportunity to satisfy yourself that the taxes for which a check was given you by the seller of those premises were paid. Since then I have not heard from you.

" I wish to advise you that while I like to be courteous and patient especially with fellow attorneys I will not allow you to unduly delay this matter or stretch it as you stretched the *Bernstein* v. *Brinn* matter. It is with regret that I notify you that if you do not comply with my request to pay the sum of $226.20 with accrued interest on those taxes by tomorrow October 9, 1928, at 1 p. m. I shall have to employ other measures against you in this matter.

" I have no right to neglect this serious matter and my duty is to enforce the prompt collection of the amount due from you. I mean to perform my duty, pleasant or unpleasant as it may be.

" Yours very truly."

" SOLOMON BRINN, Esq.,                        " *October* 23, 1928.
          " 2 Lafayette Street.
                    " New York City.

" DEAR SIR: I am discouraged with your unfulfilled promises that you always make to me and I am sorry that you do not show me any appreciation for the most considerate favors that you receive at my hands.

" Serious as your conduct may be, I assume that you are of the opinion that I consider this matter lightly, and will tolerate your nonsense in the way you unduly delay this matter and finally forget about it. If this is in your mind please divorce all such thoughts therefrom.

" I will wait in my office until tomorrow at 12:30. I want no telephone calls from you. I want the full amount which you appropriated to yourself plus interest paid to me by that time; otherwise, you will meet me before the Grievance Committee of the Bar Association at 1 P. M.

" You have nobody to blame but yourself. I think I have been very kind in the matter thus far.  " Yours very truly."

Shulman testified that between October 3 and October 23, and up to December 10, 1928, he had various conversations, by telephone and otherwise, with respondent, the substance of which was " that he [respondent] did not have a chance yet to locate all his records, and that he wanted — that the access — that is that the papers in this case, so far as he was concerned, were put away somewheres where he had no easy access to them; and I told him that it is a matter of taxes, taxes had to be paid, and that Epstein was impatient, and he was telling me — that is, I was repeating what Mr. Epstein told me — that there is danger of Mr. Epstein's house being sold for unpaid taxes in 1924 — the 1924 taxes remaining unpaid as late as October of 1928; and he always told me that he was either busy or he could not locate the records." On December tenth Shulman prepared a summons and complaint in an action in the Municipal Court, naming Sarah Epstein plaintiff, and Solomon Brinn defendant, and placed them in the hands of a process server. The latter reported service on respondent. Nothing further was heard from respondent. On the advice of Shulman, Mr. Epstein complained to the Association of the Bar of the City of New York. After Epstein complained to the Bar Association he received from respondent a receipt for the taxes. The receipt shows the payment of the taxes on January 19, 1929.

Respondent's testimony is that he forgot about these taxes. He admitted the receipt of the letters from Shulman in October,

1928. He claimed it took him from early in October to the latter part of November to find out that the taxes had not been paid. He testified that he paid the taxes before he received any notice of any complaint before the Bar Association.

An examination of the transcript of respondent's bank account shows that within a few days after he originally received Slote's check his balance was considerably less than the amount of these taxes; that many times thereafter it was below the $226.20, the total of the taxes; that during October, November and December, 1928, he did not have enough money to pay all the taxes, and finally, when he paid them in January, 1929, he had to borrow $200 to help pay them.

The official referee states in his report: " Upon Charge No. 1, the Referee finds that the evidence sustains the allegations of the petition." The record supports this finding and this court concurs therein.

As to charge No. 2, the record shows that in March, 1928, on behalf of the firm of Harry Galler & Brother (a corporation composed of Harry Galler and Max Galler, and for which firm respondent had been acting as attorney), there was placed in respondent's hands for collection a claim against one Zuckerman for $119. Respondent brought suit against Zuckerman, obtained judgment by default, issued execution and received the total amount involved from the marshal some time late in March or early in April, 1928. Then, respondent testified, he " took the check up to Max Galler, who had directed me to go to his brother for the purpose of getting the claim, and I showed him the check, and I told him that the entire amount had been collected, and that the check included the costs and disbursements in the action. * * * And I asked Mr. Galler at the time whether he could permit me to use the proceeds of the check for a short while, as I was slightly embarrassed and needed the money. Of course, I told him — our arrangement with the firm was that the disbursements were to be advanced by me, and any costs that enured in the action, and taxed on the judgment, were to be received by me in addition to the fees."

The net amount belonging to respondent's client after the deduction of respondent's fees and disbursements, respondent testified was $104. He was asked what Mr. Galler said in response to this request for permission to use the money, and he testified: " Mr. Galler said at the time that he would permit me to use the check, and as long as the firm had not straightened out their dissolution, and there were other accounts that still were to be collected, and the accountant had given — had not given a final report in the matter, that I could use the money."

Respondent further testified that in June or July, 1928, on request of Max Galler, he gave Max a check for $104 with the understanding that it would be held until respondent advised him that he had sufficient funds in bank to meet it. Next thing respondent heard Harry Galler had deposited the check and it had been returned. Max Galler assured respondent he would get the check back. In January, 1929, respondent gave Harry Galler two checks, one dated January nineteenth and the other dated January twenty-sixth, which Harry agreed to hold, respondent being short of funds. In February, 1929, he paid Max Galler $104. After that Harry called him up and said the two checks dated in January had come back. In June respondent received a communication from the Bar Association. When he received this letter he went to Max Galler, showed the letter to him, obtained from him a check for $104, which he offered to Harry Galler and, upon Harry's refusal to take this check, he got the cash for him, and he then requested Harry Galler to write the Bar Association a letter telling them he had received his money.

Max Galler's testimony is corroborative of that of respondent on the loan arrangement. He further testified that in July, 1928, he asked respondent for the money; that respondent then gave him a check for $104, said he was a little short of money and asked him to hold it; that he, Max Galler, agreed to hold it until the accountants settled up with the two brothers. Instead of holding this $104 check, however, Max Galler turned it over to his brother Harry. Harry deposited it, but it was returned, marked " Insufficient funds." Max testified that when Harry called him up about this check being returned he said, " Give it to me. I will take care of it." According to Max's testimony, in February, 1929, the partners settled their accounts. He then called respondent and asked for the $104. Respondent came up to him, gave him the $104 cash, and Max gave him back the $104 check. Max knew nothing about respondent having given Harry the two checks dated January nineteenth and twenty-sixth, respectively. Max used the $104 after receiving it from respondent. A couple of months later respondent came to Max and told him Harry had complained to the Bar Association. Max first gave respondent a check for $104, but upon Harry's refusal to take it he gave respondent $104 in cash.

Harry Galler tells a somewhat different story. His testimony is to the effect that shortly after respondent collected the Zuckerman claim he asked respondent for the money and respondent promised to send it; that when he received the $104 check from Max and deposited it, and it was returned marked " Insufficient funds," he

told Brinn about it. Later Harry Galler received direct from respondent two checks, each for $52, one dated January 19 and the other dated January 26, 1929. When deposited these two checks were returned marked " Not sufficient funds." Harry Galler asked respondent what he was going to do. Respondent gave him promises which he failed to keep. In March, 1929, Harry Galler complained to the Association of the Bar of the City of New York. Thereafter Harry Galler received a notice to appear before the grievance committee. He did so appear on July 9, 1929. Shortly before this respondent came to his place of business, paid him the full amount, and the following letter was dictated by respondent and typed on Galler's letter head:

" NEW YORK, <em>June</em> 22, 1929.

" BAR ASSOCIATION OF CITY OF NEW YORK,
  " 43 West 43d St.,
    " New York City.

" GENTLEMEN.— I desire to notify you that my claim against Solomon Brinn has been paid and settled and that I have received the sum of $104.00 the amount of the checks he gave me. It seems that this money had been paid to my brother with whom I was in partnership and this was a partnership claim and owing to some feeling between my brother and myself this matter was not straightened out until now. Will you be kind enough to return the checks left with you so that I could return them to Mr. Brinn. I feel that a mistake was made in the matter.

" Very truly yours,<br>" HARRY GALLER."

Galler did not sign this letter. His name is typed thereon. Apparently Galler was indifferent to what was written. All he was concerned about was getting his money. He told respondent to write anything he wanted. He was quite emphatic, however, that the letter would not have been written had he not received his money. He denied absolutely knowing anything about any alleged arrangement between his brother Max and respondent regarding the use by respondent of the money he had collected.

It appears that in January, 1928, and prior to the handling of the Zuckerman claim, respondent had prepared an agreement dissolving the partnership theretofore existing between Harry Galler and Max Galler, which they executed, and under which they were acting at the time respondent handled and collected this Zuckerman claim. The 6th clause of the dissolution agreement covered the collection of the firm's accounts receivable. It provided that " all of the said moneys so received shall be deposited in the firm's bank account." Respondent was fully familiar with

the provisions of the dissolution agreement. Nowhere is it shown that Harry Galler knew of the arrangement whereby respondent could use for his own purposes the money collected on the Zuckerman claim which, under the dissolution agreement, should have been deposited in the firm's bank account. On the contrary, it is shown that Harry was anxiously trying to have respondent turn over to the firm the money properly coming to it. Respondent's story of giving Max Galler $104 in February, 1929, after he had given Harry Galler two checks each for $52 in January, 1929, which checks had been dishonored, without taking up these checks, is not convincing. In fact, as the official referee said, " the respondent's testimony taken alone is sufficient to necessitate a finding of misconduct on his part."

The record before us establishes that respondent had not the slightest hesitation about using his client's money as his own. In the first instance, he withheld paying taxes from April, 1927, to January, 1929. In the second instance, he retained moneys collected from early in April, 1928, to June, 1929. In neither instance did he discharge his obligation to his client until complaint had been made to the Bar Association. The charge of conversion is established in both instances.

The respondent should be disbarred.

MERRELL, FINCH, McAVOY and SHERMAN, JJ., concur.

Respondent disbarred.